**THE ROSEN LAW FIRM, P.A.**
Joshua Baker, Esq. (BBO #695561)
Jonathan Horne (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: jbaker@rosenlegal.com
Email: jhorne@rosenlegal.com

*Lead Counsel for Lead Plaintiff and Class*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MARY HELEN YARBOROUGH, Individually and on Behalf of All Others Similarly Situated,<br><br>   Plaintiff,<br><br>   v.<br><br>ARDELYX, INC., MICHAEL RAAB, and JUSTIN RENZ,<br><br>             Defendants. | **CASE No.: 1:24-cv-12119-LTS**<br><br>**AMENDED COMPLAINT**<br><br>**<u>CLASS ACTION</u>** |

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................1

II.   JURISDICTION AND VENUE ................................................................................6

III.  PARTIES ....................................................................................................................6

IV.   DEFENDANTS' MISCONDUCT ............................................................................8

      A.   Congress Commits the United States's Resources to Dialysis and Then Seeks to
           Control Costs ....................................................................................................8

      B.   Ardelyx Makes TDAPA A Centerpiece of Its Strategy ..........................................11

      C.   Before the Class Period, Ardelyx Discovers that TDAPA Would "Effectively
           Eliminate" the Market for XPHOZAH ......................................................................13

           i.    Even as Defendants Tout TDAPA As A Viable Option, Ardelyx Tells CMS
                 that XPHOZAH Will Flounder on TDAPA ..........................................................13

           ii.   Defendants understood that the nature of the dialysis market meant
                 XPHOZAH would not thrive ..............................................................................17

      D.   The Two Ardelyx Officials Most Closely Involved In TDAPA Sell Millions of
           Dollars of Personally-Held Stock In Transactions Completely Out of Line With Their
           Prior Trading History ....................................................................................................21

      E.   Defendants announce that Ardelyx Was Not Applying for TDAPA .....................24

           i.    Defendants admit that "beginning with TDAPA, the restrictions placed on
                 exposure would effectively eliminate patient access" to XPHOZAH but blame
                 June CMS proposed regulations ..........................................................................24

           ii.   Defendants admit that Ardelyx had known long before June 2024 that
                 TDAPA would "effectively eliminate" access to XPHOZAH ...............................26

      F.   DEFENDANTS' FALSE STATEMENTS ............................................................29

      G.   LOSS CAUSATION ..............................................................................................33

      H.   ADDITIONAL FACTS FURTHER PROBATIVE OF SCIENTER ...................34

           i.    Stock Sales ............................................................................................................34

           ii.   Investor Interest in TDAPA .................................................................................34

           iii.  False exculpatory statements ...............................................................................35

iv.    Defendants' Statements to Investors Contradicted the Statements They Made to Investors ............................................................................................36

v.    Defendants Were Experts In Nephrology ....................................................36

I.    INDIVIDUAL DEFENDANTS' SCIENTER IS IMPUTED TO ARDELYX.......37

PLAINTIFFS' CLASS ACTION ALLEGATIONS.......................................................37

PRESUMPTION OF RELIANCE................................................................................39

THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE.........................................................................................................41

PRAYER FOR RELIEF..............................................................................................47

Lead Plaintiff Tate Wood and Named Plaintiffs David A. Newrider, Osama Shoair, and Gary W. Slavik, individually and on behalf of all persons similarly situated, by their undersigned attorneys, for their Amended Complaint against Defendants Ardelyx, Inc. ("Ardelyx" or the "Company"), Michael Raab, Susan Rodriguez, Linda Williams, and Elizabeth Grammer, ("Individual Defendants" and with Ardelyx, "Defendants") allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters.

## I.    INTRODUCTION

1.     This is a federal securities class action brought on behalf of all persons who purchased Ardelyx, Inc. securities between February 23, 2024, and July 1, 2024, both dates inclusive, and held such securities through July 1, 2024, seeking money damages under Sections 10(b), 20A, and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b5-1 promulgated thereunder.[1]

2.     When Ardelyx's new drug XPHOZAH was approved to be sold into the Medicare-dominated dialysis market in October 2023, investors and analysts asked Defendants how they would address an upcoming change in regulation that would take away a competitive advantage. Defendants had a solution: they would use a two-year grace period to ingrain XPHOZAH so deeply into dialysis administration that prescriptions would continue even without the advantage. But in early 2024 at the latest, Defendants learned that even during the temporary grace period, XPHOZAH sales would plummet. Rather than changing their tune, the two Ardelyx executives

---

[1] Excluded from the Class are Individual Defendants, the officers and directors of Ardelyx, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

most closely involved in regulatory discussions sold millions of dollars' worth of their personally-held stock in suspicious transactions. On July 2, 2024, Defendants announced that the deadline to file for the regulatory grace period had lapsed and that Ardelyx had not even applied. Ardelyx's stock price fell 30% in one day, damaging investors.

3.      Ardelyx is a pharmaceutical company whose most promising drug is XPHOZAH for treatment of hyperphosphatemia (excess phosphorus) in patients receiving dialysis. End-stage renal disease leaves patients with so little kidney function that they must receive dialysis or an organ transplant to survive. While dialysis attempts to substitute for certain kidney functions, patients must still strive to keep blood concentrations of various minerals under control. One of these is phosphorus.

4.      Patients typically use a class of drugs called phosphate binders to control serum phosphorus levels. XPHOZAH is a new entry indicated as a second line treatment for patients who cannot control their serum phosphate concentration with existing phosphate blockers. It was approved in October 2023. But it launched into a turbulent market.

5.      Medicare is the primary payer for dialysis. Because dialysis treatment costs so much—it accounts for 1% of **total** federal expenditures—Congress has created a unique reimbursement system. Instead of receiving reimbursement for each drug or product used in dialysis, providers receive a lump sum bundle payment per dialysis session.

6.      Orally administered drugs, including both XPHOZAH and other phosphate binders, have been separately reimbursed by Medicare Part D. The separate reimbursement gives these drugs a competitive advantage over drugs that providers must purchase using the bundle payment, because providers do not have to spend funds from their bundle payments to acquire the drugs if they are separately reimbursed by Medicare Part D.

7.      Oral drugs were scheduled to be removed from Medicare Part D coverage on January 1, 2025. After that, providers would have to pay for oral drugs from the bundle payments. At that point, XPHOZAH would become a direct cost to providers. What would happen to XPHOZAH then?

8.      Defendants claimed they could use a Medicare regulation as a stopgap. If, upon a manufacturer's application, a drug is accepted into the two-year Transitional Drug Add-on Payment Adjustment program (better known as TDAPA), dialysis providers may obtain reimbursement of the drugs at 100% of average sales price. Certain new drugs and certain drugs newly added to the Bundle are eligible for TDAPA.

9.      TDAPA would, in Defendants' telling, grant XPHOZAH a grace period during which it could become widely adopted. If patients and nephrologists grew used to XPHOZAH during the TDAPA period, then dialysis centers might continue to dispense the drug even if it was not separately reimbursed. And even if they did not, Ardelyx would at least have two more years' worth of sales proceeds. So, before the Class Period, Defendants told investors Ardelyx would "certainly" apply for TDAPA.

10.      During the Class Period of February 22, 2024 through July 1, 2024, Defendants did nothing to disabuse investors that Ardelyx would apply for TDAPA. As late as May 2024, Defendant Michael Raab, Ardelyx's CEO, continued to assure investors that Ardelyx planned to apply for TDAPA. Defendants also told investors that TDAPA offered a viable option for at least two years' worth of revenues.

11.      But Defendants had concluded otherwise. Patients can pick up Medicare Part D drugs in any pharmacy. But drugs under TDAPA are covered by Medicare Part B and must be dispensed by dialysis centers. Dialysis centers do not have the legal obligation to stock any given

drug. Moreover, they rely on treatment protocols for drug administration. They are reluctant to add TDAPA drugs to their protocols and formularies because even if the drug is successful, then in two years, the centers must either buy the drug using bundle funds at a significant loss or stop dispensing the drug, angering patients. The protocols then constrain nephrologists' prescription decisions. As Defendant Raab later put it, ***"[i]t is absolutely clear*** that within the Bundle and beginning with TDAPA, the restrictions placed on exposure would ***effectively eliminate patient access*** to" XPHOZAH.

12.     So even as Defendants told investors that TDAPA was a viable alternative, Defendants Elizabeth Grammer and Laura Williams were telling the Centers for Medicare and Medicaid Services ("CMS"), Medicare's administrator, that adding XPHOZAH to the bundle would eliminate patient access. In a March 14, 2023 presentation to CMS, Grammer and Williams cited as evidence the experience of several other drugs which had entered TDAPA. Neither the presentation nor the follow-on March 13 letter was made publicly available.

13.     In March, May, and June, 2024, Grammer and Williams, sold a combined 607,449 shares of Ardelyx stock, reaping proceeds of $5.0 million. Grammer and Williams each made a majority of these sales—427,170 shares, for total proceeds of $3.5 million—on just two days (Grammer: May 6; Williams: June 5). Though each had adopted Rule 10b5-1 plans in December 2023 that pre-scheduled certain stock sales, neither plan covered these 427,170 additional shares. Grammer and Wiliams did not identify any specific purpose (such as paying taxes on stock awards) for the sales. The sales accounted for 37.6% (Grammer) and 33.6% (Williams) of total shares available to sell. And the proceeds amounted to several years' worth of their cash compensation.

14.     Neither Grammer nor Williams had ever done anything like this. Since the beginning of 2021, the two had sold a combined 280,000 shares (Grammer: 210,103; Williams:

68,262). And even these numbers understate the difference between the Class Period and prior sales, because all Grammer's pre-Class Period sales had been pursuant to a Rule 10b5-1 plan.

15.     On July 2, 2024, Ardelyx astounded the market by announcing that the deadline to apply for TDAPA had passed and that Ardelyx had not applied. In a press release and in a call to discuss the decisions, Defendants stated four times in prepared remarks that the restrictions would "effectively eliminate patient access" during the TDAPA period. Baffled analysts asked Defendants to explain the abrupt turn-around. Defendants cited the experience of other drugs, focusing on two, Korsuva and Parsabiv. Both had been covered in Williams's and Grammer's March 11 presentation to CMS as demonstrating XPHOZAH's likely prospects under TDAPA and thereafter.

16.     Near the end of the call, an analyst finally asked the question implicit in previous requests for an explanation. The results of including Korsuva and Parsabiv in TDAPA and the bundle were known long before the Class Period. Why, then, had Defendants told investors that TDAPA was a cornerstone of Ardelyx's strategy?

17.     Trapped, Ardelyx CEO Michael Raab responded that Ardelyx had intended to seek TDAPA right until proposed rules enacted by CMS on June 27, 2024. It was these rules that made TDAPA untenable, not the facts that were known to Ardelyx before the Class Period.

18.     Defendant Raab's statement was not true. In July, Ardelyx sued CMS to prevent it from revoking Medicare Part D coverage. Ardelyx sought a preliminary injunction, but CMS maintained that any irreparable injury was self-inflicted because Ardelyx could have sought to be included in TDAPA. In response, Ardelyx submitted a declaration signed by Williams. Over 26 paragraphs, Williams explained exactly how Ardelyx had concluded that TDAPA "effectively eliminated" access.

19.     She didn't even mention CMS's June 27 proposed regulations.

20.     Grammer and Williams made millions of dollars selling shares while Defendants' misleading statements gave investors false hope that TDAPA was a viable alternative for XPHOZAH. While they profited, investors were left holding the bag. On July 2, after Defendants' surprise announcement, Ardelyx's share price fell 30%, damaging investors.

## II.     JURISDICTION AND VENUE

21.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

22.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

23.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

24.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III.     PARTIES

25.     Lead Plaintiff Tate Wood purchased Ardelyx common stock during the Class Period and was damaged thereby. His PSLRA certification was previously filed with the Court and is incorporated by reference herein.

26.     Named Plaintiffs David A. Newrider, Osama Shoair, and Gary W. Slavik purchased Ardelyx common stock during the Class Period and were damaged thereby. Their PSLRA certification are attached as Exhibits and are incorporated by reference herein.

27.     Defendant Ardelyx, Inc. is an early-stage pharmaceutical company. Ardelyx launched its first drug, IBSRELA, in 2022. XPHOZAH, approved in October 2023, is Ardelyx's only other product.  Defendants have repeatedly cited their senior executives' experience with nephrology (the medical discipline focusing on kidneys) to investors.

28.     Defendant Michael Raab has served as Ardelyx's CEO since 2009. From 1991-2002, Raab served as Genzyme Corporation's renal division's Senior Vice President – Therapeutics and General Manager. In this position, Raab launched and oversaw the sales growth of sevelamer, a phosphate binder for the treatment of hyperphosphatemia, with over $1.0 billion in worldwide sales in 2013.

29.     Defendant Susan Rodriguez served as Ardelyx's Chief Commercial Officer from May 2020 through May 2024. According to her public LinkedIn profile, Rodriguez  "[d]eveloped and executed disruptive go to market strategies for IBSRELA and XPHOZAH based on comprehensive market insights, analysis, innovative product positioning, and highly targeted commercial focus." Rodriguez has worked in the biotechnology industry since 1986. Between 1998 and 2005, Rodriguez served as a Vice President/General Manager of an Abbott Pharmaceutical division, where she focused on the renal industry.

30.     Defendant Laura Williams joined Ardelyx in November 2020 as its Senior Vice President – Global Therapeutic Strategies and Patient Advocacy. She was promoted to Chief Medical Officer in October 2021.  Williams was one of Ardelyx's three most highly compensated officers in 2022 and 2023.

31.     Defendant Elizabeth Grammer joined Ardelyx as its Executive Vice President and General Counsel in November 2012. In January 2020, Grammer was elevated to the position of Chief Legal and Administrative Officer, which she has held since. Grammer was one of Ardelyx's three most highly compensated officers in 2021 and 2023.

32.     Defendants Raab, Rodriguez, Williams, and Grammer are the "Individual Defendants" and, with Ardelyx, the "Defendants."

IV.     **DEFENDANTS' MISCONDUCT**

A.     **Congress Commits the United States's Resources to Dialysis and Then Seeks to Control Costs**

33.     End stage renal disease is a debilitating disease in which kidney function has declined so much that kidneys can no longer function without assistance. Patients with end stage renal disease will die within weeks without dialysis or a kidney transplant.

34.     Dialysis attempts to perform the kidney's function by removing waste products and excess fluid from the blood.

35.     Dialysis is usually administered three times a week for at least 3 hours each session. Though a limited number of patients can receive dialysis at home, patients usually receive it at a hospital or dialysis clinic.

36.     In 1972, Congress extended Medicare coverage to all patients on dialysis. Patients on dialysis are eligible for Medicare regardless of age. Today, Medicare pays for a significant majority of dialysis in the United States.[2]

---

[2] USRDS, *Annual Data Report – End Stage Renal Disease: Healthcare Expenditures for Persons with ESRD*, available at https://usrds-adr.niddk.nih.gov/2022/end-stage-renal-disease/9-healthcare-expenditures-for-persons-with-esrd.

37.    Congress's decision committed enormous resources to dialysis. For example, in 2019, Medicare spent $53 billion on dialysis.[3] The $50 billion or so annual expenditures on dialysis typically amounts to about 1% of total federal expenditures. The federal government has a legitimate interest in controlling these costs.

38.    In 2008, Congress enacted a statute creating a unique reimbursement scheme for dialysis. Rather than reimbursing each individual dialysis expenditure, Medicare pays dialysis providers a single lump-sum payment for each dialysis session. The payment is commonly referred to as the Bundle. The Bundle covers all aspects of dialysis (except physician fees), such as drugs, supplies, and tests. The Bundle is paid to the dialysis center regardless of, and in lieu of reimbursement for, actual expenses. Providers retain the difference between the total Bundle payment and the costs of dialysis-related fees. In 2019, Bundle payments amounted to approximately $7.9 billion.

39.    In enacting this payment structure, Congress recognized that dialysis imposes a unique burden both on patients and on the public fisc. The method of payment is intended to provide incentives to dialysis centers to develop and apply efficient practices.

40.    Among the things covered by the Bundle are drugs administered to patients who receive dialysis. With so little kidney function remaining, patients with end stage renal disease must control blood concentrations of various minerals through diet and medications. These include calcium, sodium, and potassium, as well as phosphorus, measured as serum phosphate levels.

---

[3] Anshul Bhatnagar et al, *Hemodialysis Verus Peritoneal Dialysis Drug Expenditures: A Comparison Within the Private Insurance Market*, July 7, 2023, available at https://www.sciencedirect.com/science/article/pii/S2590059523000948

41.     There is an existing class of drugs that controls phosphorus levels, called phosphate binders. Ardelyx obtained FDA approval of its new phosphorus-lowering drug XPHOZAH in October 2023. XPHOZAH is not a phosphate binder; it has a different mechanism of action.

42.     XPHOZAH removes significantly less phosphorus than phosphate binders. The normal range of serum phosphate concentrations is 2.5-4.5 milligrams per deciliter (mg/dL). Dialysis patients try to keep the range below 5.5 mg/dL. Phosphate blockers reduce serum phosphate levels by 1.5-2.2 mg/dL. XPHOZAH reduces serum phosphate by about 0.7-1.5 mg/dL.

43.     But XPHOZAH also has a lower pill burden. Patients on dialysis must limit their fluid intake, so the lower pill burden makes XPHOZAH more tolerable.

44.     Generic phosphate binders have been available for decades. As a result, they are priced economically. Although new phosphate binders have been approved in recent years, Ardelyx decided to price XPHOZAH at approximately $35,000 per year, or about a 30% premium to the most expensive new branded phosphate binder.

45.     Both phosphate binders and XPHOZAH are taken orally. There is no injectable substitute for either.

46.     In 2009, the Centers for Medicare & Medicaid Services ("CMS"), which administers Medicare, promulgated rules that would remove separate Medicare Part D coverage from oral-only, non-injectable drugs, and place them in the Bundle instead ("Oral Drugs Rule").

47.     In 2012 and 2014, Congress delayed implementation of the Oral Drugs Rule without overruling it.

48.     As of the beginning of the Class Period, the Congressional extension was set to expire on January 1, 2025. Until then, oral-only drugs would be covered by Medicare Part D.

49.     Medicare Part D coverage mitigates the harms of Ardelyx's pricing decision. XPHOZAH's high price reduces affordability because it is illegal for a manufacturer to cover patients' Medicare obligations. But patients may obtain Medicare Part D drugs from pharmacies, without involving dialysis providers. Pharmacies are fully reimbursed for drug sales, with a profit, so they have an incentive to stock XPHOZAH.

### B.    Ardelyx Makes TDAPA A Centerpiece of Its Strategy

50.     To encourage innovation, in 2016, CMS enacted a rule which allows manufacturers of certain new drugs or certain drugs newly added to the Bundle to apply for a two-year temporary grace period. If Medicare accepts the application, then during the two-year period, Medicare will make separate payments to reimburse providers for the drugs. These payments supplement the amounts the providers receive from the Bundle. The program is called the Transitional Drug Add-on Payment Adjustment, but it is usually referred to as TDAPA. During the two-year TDAPA period, drugs are reimbursed at 100% of average sales price. Thus, dialysis centers have an incentive to prescribe drugs on TDAPA because they do not have to spend their Bundle payments to acquire the drugs.

51.     The TDAPA period also allows CMS to measure the drug's usage and, therefore, total cost to dialysis providers. CMS then raises the amount of the Bundle payment to cover the additional costs. The increase in the amount of the Bundle payment will, according to the statutory scheme, ensure that Medicare pays enough money to dialysis providers to allow them to administer the new drug to patients who need it even without separate reimbursement.

52.     TDAPA was a cornerstone of Ardelyx's strategy.

53.     On August 2, 2023, before the Class Period, Defendant Raab told investors:

Q: I guess a little more on the TDAPA that you mentioned. So I'm assuming that you have to apply for this. Is my assumption that you guys would apply for this if it was indeed put in the bundle, however, Mike, that may be?

DEFENDANT RAAB Yes. I mean, whatever the process is to get those data collected, *we would certainly participate in that.*

54.    Then, on November 16, 2023, at the Jefferies Healthcare Conference, Ardelyx CFO and COO Justin Renz told investors that "[s]hould the dialysis bundle not be resolved for phosphate – oral phosphate-lowering therapies, we would, in fact, apply at the end of next year for the TDAPA period, which could give you two or more years of extended time for the government to figure out utilization."

55.    Renz told investors again in a November 29, 2023 presentation at the Piper Sandler Annual Healthcare Conference that:

> *[W]e will do everything we can to get TDAPA, which should be something we would—again, should this happen, we would apply for it in the second half of 2024 to make sure that we qualify for '25 and '26 certainly as a minimum, so we can see utilization.* But our goal would to be to do everything we can to have it part of the treatment regimen because we believe to your point, it would be unethical to take a patient who is in range with the benefit of our therapy and take them off to save some money.

56.    As of February 22, 2024, the first day of the Class Period, Defendants did nothing to dispel the impression they had given that TDAPA was a centerpiece of Ardelyx's XPHOZAH strategy. In Ardelyx's 2023 10-K filed that day, Defendants warned that CMS might not accept the XPHOZAH TDAPA application, but did not even raise the possibility that Ardelyx might not apply. As late as May 5, 2024, Defendant Raab reassured investors that "our intent is to enter TDAPA."

57.    Analysts got the message loud and clear.

a.    In a February 22, 2024 report, an analyst employed by Jefferies wrote that:

> We believe HR-5074 [a bill that would have extended the period in which CMS could not add oral-only drugs to the Bundle] will pass in some shape or form and in fact doesn't need to be passed in 2024 since Xphozah will be on TDAPA and revenue growth should be preserved.

12

b.   In a May 2, 2024 report, an analyst employed by Piper Sandler wrote that:

[W]e remind investors that even if this bill does not get passed in 2024, Xphozah's TDAPA protection will kick in, providing a carve-out till 2027, thus providing insulation if in fact other orals go into the bundle next year.

### C.   Before the Class Period, Ardelyx Discovers that TDAPA Would "Effectively Eliminate" the Market for XPHOZAH

#### i.   Even as Defendants Tout TDAPA As A Viable Option, Ardelyx Tells CMS that XPHOZAH Will Flounder on TDAPA

58.   Markets had had some negative experiences with previous drugs which went through TDAPA, but investors were not sure how to understand the experience.

59.   For example, on a February 22, 2024 call, an analyst asked Ardelyx "at what point you would move to secure TDAPA for XPHOZAH," adding that "I'm not sure if the calcimimetic [a drug that mimics the action of calcium] experience would be a relevant proxy here." Calcimimetics had initially been reimbursed under TDAPA but, starting January 1, 2018, were placed under TDAPA. Their use had sharply declined both during and immediately after the TDAPA period. The market for calcimimetics had continued to shrink since then.

60.   Defendants declined to answer the question. But Defendants plainly had some information that investors did not. Ardelyx employed a XPHOZAH sales team of sixty who were speaking to nephrologists (doctors who specialize in kidneys) every day.  Defendants boasted of their exquisite knowledge of the nephrology market. Defendants Raab and Rodriguez both had experience leading nephrology units of large pharmaceutical companies.

61.   Thus, Defendants' continued assurances that Ardelyx would apply for TDAPA gave investors the impression that TDAPA was a viable option. But at the same time, Ardelyx was telling CMS the opposite.

62.     On March 11, 2024, Ardelyx delivered a presentation to CMS arguing that CMS should not include XPHOZAH in the Bundle. Neither the subject-matter of the presentation (nor its existence) nor the accompanying slides were publicly disclosed.

63.     According to presentation slides, three Ardelyx executives attended the presentation: an Ardelyx Senior Vice President of Government Affairs & Patient Advocacy, and Defendants Williams and Grammer. On Slide 3, Ardelyx provided an extended biography of Defendant Williams, showing that she was Ardelyx's lead presenter.

64.     After the Class Period, Ardelyx sued CMS to prevent it from adding XPHOZAH to the Bundle ("CMS Action"). In the CMS Action, Ardelyx cited Korsuva as the key precedent in its explanation of how it determined that TDAPA would "effectively eliminate" access to XPHOZAH.  Ardelyx also cited Parsabiv, a calcimimetic. *See* ¶¶115, 121-125, below.

65.     Slide 7 of the presentation summarized the impact TDAPA had had on drugs that entered the program:

## IMPACT/POTENTIAL IMPACT OF ESRD PPS

| ESRD Complication | Treatments | Impact/Potential Impact of Bundle |
|---|---|---|
| Anemia | • ESAs (IV; various agents)<br>• HIF-PHIs [oral; Daprodustat (Jesduvroq)] | • Decreased cost; improved patient outcomes (based on scientific data)<br>• *No significant cost accrued; Clinical impact on patients not fully-ascertained, but diminished treatment choice and loss of shared decision making; Innovation Lost….* |
| CKD-MBD (SHPT) | Active Vit D (IV and Oral) | • *Less cost (mostly because of oral administration); No known untoward effect or impact on patients* |
| | Calcimimetics<br>• Cinacalcet (oral; Sensipar)<br>• Etelcalcitide (IV; Parsabiv) | • *Less cost with oral generic cinacalcet*<br>• *Potential negative impact on patients*<br>  – *Worsening PTH control that could progress to more severe disease requiring surgical intervention (metrics not adequately monitored or captured)*<br>  – *Varying strategies among dialysis facilities (only IV, only daily oral, 3X/week oral, or IV as 2nd line) without discernable risk-adjustment*<br>  – *No safeguards in place to assure IV therapy provided to those who need it*<br>  – *No long-term outcome measures to evaluate full impact on patients*<br>  – *Innovation Lost….* |
| CKD-associated pruritis (CKD-aP) | • Topical creams; Combination of narrow-band UVB phototherapy and naltrexone<br>• Difelikefalin (IV; Korsuva) | • *No significant cost accrued; Impact on patients not fully-ascertained; Innovation Lost….* |



66.      The presentation mentions four drugs: an anemia treatment, Jesduvroq; two calcimimetics, Parsabiv and Sensipar; and Korsuva, a treatment for itching (pruritis). Two of those, Jesduvroq and Korsuva, were currently in their TDAPA period. As to both Jesduvroq and Korsuva, Defendants noted that there was "[n]o significant cost accrued" because that there was little to no use of these drugs during the TDAPA period.  As to all four drugs, Defendants claimed "Innovation Lost," because the drugs that had been developed had become unavailable.

67.      In Slide 4, Defendants stated that "there is no stop-gap measure to ensure a prescription therapy is made available." The presentation slides never mentioned TDAPA.

68.      On March 13, Ardelyx sent CMS a follow-up letter further urging CMS not to include XPHOZAH in the Bundle. Williams signed the letter.

69.      In the March 13 letter, Williams represented that "[n]ephrologists and dialysis providers have observed that the addition of new drug therapies to the ESRD PPS can produce

negative effects, *as exemplified by the limited access patients today have to effective calcimimetic therapy options and a new antipruritic drug (Korsuva)"* (emphasis added). At the time, Korsuva was still under TDAPA, meaning that Williams was describing access limitations during TDAPA.

70.    Williams added that "[p]roviders have also experienced delays in accessing therapies *during their transition from Medicare Part D into the ESRD PPS*."

71.    Each of the drugs mentioned in Williams's presentation, especially Korsuva, had fared poorly either in the TDAPA period or immediately after it stopped.

    (a) Korsuva

72.    Korsuva's TDAPA period terminated on March 31, 2024. In October 2023, CMS announced that the increase in the Bundle to account for Korsuva would be only $0.25. The minimal increase shows that very little Korsuva was being sold.

73.    On November 13, 2023, Korsuva's manufacturer, Cara Therapeutics, held a call to discuss Q3 2023 earnings. On the call, Cara Therapeutics stated that "our expectations for Korsuva are now greatly reduced." Cara Therapeutics added that "[t]he significant challenges in the uptake of Korsuva, *even with its TDAPA designation*, stem from the unique capitated dialysis reimbursement system in the US."

74.    Then, on January 22, 2024 Cara Therapeutics held a special corporate update call to announce that it was discontinuing its kidney disease program and cutting half of its staff. On the call, Cara Therapeutics announced that it did "*not expect significant revenue contribution*" from Korsuva after TDAPA.

    (b) Calcimimetics (Parsabiv & Sensipar)

75.    Parsabiv and Sensipar are both sold by drug giant Amgen Inc. They both entered the TDAPA period on January 1, 2018, and left TDAPA on December 31, 2020.

76.     Sensipar's U.S. sales fell from $322 million in the quarter ended December 31, 2017 (i.e. just before TDAPA) to $11 million in the quarter ended December 31, 2020 (the last quarter on TDAPA). Sales continued to decline until, for the quarter ended December 31, 2022, Amgen stopped separately reporting sales.

77.     Amgen launched Parsabiv substantially during the TDAPA period. While Parsabiv's sales rose to $156 million during the TDAPA period, by the quarter ended December 31, 2020, the last quarter of TDAPA, Parsabiv's sales had fallen to $143 million. In Q1 2021, the first quarter without TDAPA, Parsabiv's sales fell to $46 million.

(c) Jesduvroq

78.     GlaxoSmithKline sells Jesduvroq. Jesduvroq was approved by the FDA in February 2023.

79.     Jesduvroq entered TDAPA on October 1, 2023.

80.     Sales were so dismal that the proposed Bundle adjustment for Jesduvroq, announced July 2024, was $0.0019, or one fifth of a penny. The adjustment shows that nearly no nephrologists were prescribing Jesduvroq, information that would have been readily available to Ardelyx by asking nephrologists.

81.     Jesduvroq was withdrawn from U.S. markets on December 19, 2024.

>        *ii.*     *Defendants understood that the nature of the dialysis market meant XPHOZAH would not thrive*

82.     Patients can buy drugs reimbursed by Medicare Part D from any pharmacy. But once a drug is placed into the Bundle, even if it is separately reimbursed under TDAPA, patients can no longer purchase the drug at a pharmacy. That's because Medicare reimburses Bundle drugs under Medicare Part B, not D. Instead, bundle drugs (whether or not they are covered by the

TDAPA program) must be dispensed by the dialysis center itself. Thus, for drugs under TDAPA, the dialysis center both administers dialysis and serves as the patient's "pharmacy."

83.    Patients have no enforceable entitlement to have their dialysis center stock a drug. If a dialysis center determines not to stock XPHOZAH, then patients must take another treatment or switch dialysis centers, the latter of which is extremely disruptive. While patients may make complaints, neither Ardelyx nor the patient has a right to appeal dialysis centers' discretionary decision not to stock or dispense XPHOZAH.

84.    The dialysis market is dominated by two dialysis providers, DaVita and Fresenius, each of which operates thousands of dialysis centers. Each has about a 40% market share. Both DaVita and Fresenius make stocking decisions at the company level rather than allowing individual dialysis centers to make purchasing decisions. DaVita and Fresenius each also have in-house dispensaries which only make some drugs available to the dialysis centers, not all.

85.    The remaining 20% of the market consists of relatively small dialysis providers. Without the market power of DaVita or Fresenius, these smaller providers cannot negotiate contracts that include all available drugs. Moreover, Medicare's calculation of the reimbursement rate under TDAPA, average sales price, includes all discounts negotiated by DaVita and Fresenius. As a result, the smaller providers will frequently face a negative margin on distribution of drugs under TDAPA.

86.    Patients on dialysis must control blood concentrations of numerous minerals, are at risk of numerous comorbidities, and face numerous complex drug interactions. Nephrologists refer to treating patients on dialysis as "whack-a-mole" because treatments for patients' conditions usually affect other things the patient is trying to control. For instance, to control phosphorus, a patient may take calcium acetate. But calcium acetate raises the patient's blood calcium

concentration, which the patient must also control. So the patient may reduce dosage of calcitriol, to reduce calcium levels, which then might cause the patient's parathyroid hormone levels to grow too high. Creating an artificial equilibrium for patients who do not have kidney functions can require frequent changes. Moreover, even if the patient reaches an equilibrium, changes in the patient's diet might throw the equilibrium out of alignment, necessitating further changes. And patients have fewer resources: end stage renal disease is associated with lower economic status, and regular dialysis sessions preclude many forms of employment.

87.    Thus, treating patients requires coordination between patients, nephrologists, and dieticians to solve complex and evolving problems. But the patients' nephrologists are usually not present for administration of dialysis. The dialysis is administered by a technician and patients have access to a dietician. Nephrologists seek to minimize interruptions to their workdays from the dialysis unit by addressing patients' concerns in a single comprehensive monthly visit. If a nephrologist prescribes XPHOZAH but the dialysis center does not stock it or the patient's insurance does not cover it, patients will face delays accessing the medication, particularly if the patient must wait for the next monthly comprehensive visit to discuss the issue with the doctor. The delay puts patients' health at risk.

88.    To prevent known drug interactions and treat comorbidities within the patients' limited resources, dialysis companies draft lengthy, detailed algorithmic protocols. These protocols are pages and pages long. By codifying standard of care, the protocols significantly reduce the need for physicians and dieticians to formulate new treatment options for the numerous needs of patients with end stage renal disease.

89.    For efficiency's sake, individual companies write protocols that are as broadly applicable as possible without regard to patient's insurance coverage. Dialysis providers are

reluctant to draft protocols that include drugs that are on TDAPA. Rewriting protocols is complicated and takes extensive employee time. Moreover, dialysis providers know that after two years, drugs on TDAPA will stop being reimbursed at average sales cost and will instead become a significant expense. The dialysis provider will then have to choose whether to remove the drug from its formulary, which will infuriate patients, or keep the drug on the formulary, and suffer financial losses. So providers hesitate to add TDAPA drugs into their protocols.

90.     While nephrologists are ultimately responsible for every prescription, they rely on the dialysis providers' protocols to efficiently treat the complex and common problems of patients on dialysis. Moreover, patients and their nephrologist must make an exemption request to obtain a drug that is not on formulary. The exemption process is lengthy and tedious, often by design, and takes significant staff time. Thus, protocols also constrain nephrologists.

91.     Thus, switching from Medicare Part D coverage (where the dialysis providers are not involved) to Medicare Part B coverage (where the dialysis providers dispense the drug) significantly restricts access.

92.     Though these facts are obscure to investors, they were well known to Defendants. Ardelyx boasted as early as March 2023 that its senior executive team is "well steeped in nephrology, well networked across the country, and … in a high-level of preparedness" for the XPHOZAH launch. Raab and Rodriguez have both led launches of new renal therapeutic products. And Ardelyx hired 60 XPHOZAH salespeople who spoke with nephrologists every day.

93.     Indeed, Defendants themselves understood the issue. As Justin Renz, Ardelyx's CFO and COO, explained after the close of the Class Period at a December 4, 2024 presentation:

> So, TDAPA was put in place essentially for dialysis patients that essentially have a level playing field and so they would have access to all medicines and the motives were pure. Unfortunately, it's the unintended consequences of said decision that is what the real world is facing and so Korsuva is a tremendous example. Very good

drug approved for pruritus and essentially what happens is *dialysis organizations have protocols that they follow and they have to have this across their organizations and what have—they prioritize unfortunately sometimes medicines that are less innovative and less expensive than more innovative and more expensive.*

*And so, we did not want to fall victim to being a protocolized medicine that is not decided on best fits the nephrologist and the patient.* So our desire was to absolutely keep the decision-making between the nephrologist and the patient, and the only way we found we could do that was to stay out of the absence with the TDAPA program.

### D.    The Two Ardelyx Officials Most Closely Involved In TDAPA Sell Millions of Dollars of Personally-Held Stock In Transactions Completely Out of Line With Their Prior Trading History

94.    During the Class Period, Grammer and Williams made massive, unprecedented stock sales:

*Grammer*

| Date | Number of shares | Proceeds |
|---|---|---|
| March 20, 2024 | 86,000 | $664,780 |
| May 3, 2024 | 45,000 | $405,000 |
| May 6, 2024 | 64,233 | $552,006 |
| May 6, 2024 | 219,937 | $1,953,040 |
| *May 6 subtotal* | *282,170* | *$2,505,047* |
| May 21, 2024 | 6,927 | $54,100 |
| *Total* | *420,097* | *$3,628,927* |

*Williams*

| Date | Number of shares | Proceeds |
|---|---|---|
| May 3, 2024 | 39,949 | $333,574 |
| May 23, 2024 | 4,794 | $37,441 |
| June 5, 2024 | 45,000 | $320,400 |
| June 5, 2024 | 100,000 | $713,000 |
| ***June 5 subtotal*** | ***145,000*** | ***$1,033,400*** |
| ***Total*** | ***187,352*** | ***$1,404,415*** |

95.     During the Class Period, Grammer sold 420,097 shares for $3.6 million, while Williams sold 189,743 shares for $1.4 million.

96.     In both cases, a significant majority of the sales occurred on just one day. Specifically, Grammer sold 282,170 shares on May 6, 2024, for $2.5 million, while Williams sold 145,000 shares on June 5, 2024, for $1.0 million.

97.     Rule 10b5-1 allows executives to pre-plan stock sales. That a sale was made pursuant to a proper Rule 10b5-1 plan provides an affirmative defense to charges of insider trading. Grammer and Williams did adopt Rule 10b5-1 automatic sales plans on December 21 and December 27, 2023, respectively. Yet the May 6 and June 5 sales were not made pursuant to these recently-adopted plans. Nor did Grammer and Williams declare any specific objective for the sales, such as paying tax obligations that come due upon the vesting of restricted stock awards.

98.     Neither Grammer nor Williams had ever engaged in similar sales. Between January 1, 2021, and February 22, 2024, Grammer only sold 210,103 shares. Of these, ***all*** were sold pursuant to a Rule 10b5-1 plan or to satisfy tax obligations. Nor had Grammer previously engaged

in any selling spree. Indeed, from the beginning of her reporting history in 2014 through December 31, 2020, Grammer had only sold 126,491 shares.

99.     Williams's sales were also anomalous. Between October 2021, when she began reporting transactions, and the beginning of the Class Period, Williams had sold just 68,262 shares, of which 18,262 were pursuant to a Rule 10b5-1 plan or to satisfy tax obligations.

100.     The sales exceeded Grammer and Williams' cash compensation. Williams's ***total*** cash compensation in 2022 and 2023 was $664,810 and $715,000, respectively, for a total of $1.38 million. Grammer's total cash compensation from 2021 and 2023, respectively, was $663,300 and $534,600, for a total of $1.20 million. Ardelyx did not disclose Grammer's 2022 compensation because she was not one of Ardelyx's three most highly compensated officers that year

101.     The sales amounted to a significant portion of Grammer and Williams's total shares. Grammer's sales and Williams's sales totaled 37.6% and 33.7% of all the shares that were available for them to sell during the Class Period.

102.     Grammer and Williams were the individual Ardelyx executives most closely involved in negotiations with CMS and evaluation of TDAPA. In the CMS Action, Ardelyx cited 5 communications with CMS: the March 11 presentation, the March 13 letter, covered above, as well as three additional communications which occurred in 2023 (one presentation and two additional letters). Ardelyx did not disclose who delivered the additional presentation, but Grammer signed one of the two letters. Further, CMS formally communicated to Ardelyx its decision to add XPHOZAH to the Bundle in a May 13, 2024 letter-decision addressed to Williams.

103.     As a result of their close personal involvement with CMS negotiations and TDAPA, Grammer and Williams were the senior executives most knowledgeable about each.

### E.    Defendants announce that Ardelyx Was Not Applying for TDAPA

> i.    *Defendants admit that "beginning with TDAPA, the restrictions placed on exposure would effectively eliminate patient access" to XPHOZAH but blame June CMS proposed regulations*

104.    On July 2, 2024, Ardelyx published a press release announcing that the deadline to file a TDAPA application had passed and that Ardelyx had not filed one. Defendants also held a call to discuss Ardelyx's decision.

105.    In the press release, Ardelyx quoted Defendant Raab as saying:

We have carefully and thoughtfully considered the potential impact of CMS's decision to add XPHOZAH into the Medicare PPS and have determined that *even during the TDAPA* period, the restrictions placed on XPHOZAH would be such that patient access to this novel therapy would be *effectively eliminated* for all patients.

106.    On the call, in prepared remarks, Defendant Raab stated that ***"[i]t is absolutely clear*** that within the Bundle and beginning with TDAPA, the restrictions placed on exposure would *effectively eliminate patient access* to this novel therapy for all patients." A few minutes later, Defendant Raab stated, again in prepared remarks, that "we recognize that participating in TDAPA would severely restrict and *effectively eliminate* access to exposure for all patients." Defendant Raab then stated, still in prepared remarks, that "*ample evidence from recent novel therapies entering the Bundle* makes it clear that access to exposure is likely to be significantly restricted and *effectively eliminated* for all patients."

107.    In the question-and-answer portion of the call, a series of analysts asked Defendants for an explanation for their decision. Again and again, Defendants returned to the same answer: Ardelyx knew access to XPHOZAH would be "effectively eliminated" during the TDAPA period because of the experience of other drugs.

108.    Near the end of the call, an exasperated analyst directly asked Defendants why they had previously told investors that TDAPA was a viable option only to change course based on information that they would have known at the time of their statements. The following exchange occurred:

Q: Hey. Thanks. Mike, I'm sorry, I think this question is maybe a little repetitive. But I'm just trying to understand here, what's happening here. Since this call, I've been looking at the CMS proposed rule. And I know you cited that. But you also cited the way that Parsabiv and Korsuva were treated through the TDAPA period. But, up until recently, I think you guys have been talking about this TDAPA as a cornerstone strategy. So I guess the question is that—I know you've been asked about this rule, what's different, but what exactly in the language changes sort of the calculus? And wouldn't you have known about the way that Parsabiv and Korsuva were treated before this decision, like meaningfully before? Like, what—I'm sorry if this is repetitive again, but what's changed here? Is it the rule? Or is it just your interpretation of this?

DEFENDANR RAAB: Yes. So, if you follow what people have believed up until the draft guidance that was earlier this—couple of months ago, everyone was of the mind that we would be part of the TDAPA period similar- along with [phosphate] binders. Which then, it's been a unique process for binders, where there's a base rate increase similar to what occurred to Parsabiv.
That is not how we're being treated. As you read the documents, you can see that it's explicit that we will not be included in the TDAPA period, the binders and the calculation of the binders are going to go through. We will be treated as new renal dialysis drugs, which is how Korsuva was treated. So that is the conclusion that I have been consistent in saying when we see the proposed PPS that was to come out as it did at the end of June, that's going to drive a lot of decision making. That's what I've consistently said for us, ***and that is what drove us to that decision.***

109.    Defendant Raab is referencing CMS's 2025 PPS proposed rules, which were issued on June 27, 2024. Defendant Raab had previously cited the rules in the call.

110.    Analysts understood Raab to be stating that Ardelyx was not applying to TDAPA because of CMS's June 27 proposed regulations.

a.    In a July 2, 2024 report, a Leerink analyst wrote that:

1) [Ardelyx's] main reason for their decision [not to apply for TDAPA] was based on CMS' ESRD PPS Proposed Rule for CY25 (see page 106-107 HERE) which indicated that Xphozah would be included in the bundle as of Jan 1, 2025 as a "renal dialysis service drug" but would be treated differently from oral-only phosphate binders.

    b.   In a July 2, 2024 article, an analyst employed by Piper Sandler wrote that:

**Out of the blue.** [Ardelyx] will not file for TDAPA for Xphozah. As background, CMS' TDAPA (Transitional Drug Add-on Payment Adjustment) allows for 2 years of reimbursement outside the bundle for innovative therapies used in ESRD. With CMS' plan to include oral only drugs into the bundled payment system beginning January 1, 2025, [Ardelyx] has long articulated a strategy to file for TDAPA,. [sic] In a June 27 document, CMS has identified Xphozah as a "renal dialysis service" instead of grouping it with phosphate binders, and signaled that it will reimburse in such a way that would necessitate [Ardelyx] to discount heavily in order to incentivize use.

    c.   In a July 2, 2024 report, a TD Bank analyst wrote that:

[Ardelyx] announced that it decided not to file for TDAPA (which would have added a payment outside the ESRD bundled payment for two years). [Ardelyx] indicates that it has made this decision since utilization post-2025 under current CMS guidelines would effectively eliminate access to Xphozah for all patients, in the company's opinion.
As background, on June 27th, the CMS released the proposed ESRD rules which included guidelines for the planned inclusion of oral-only CKD drugs into the ESRD bundle, which will effectively change how phosphate lowering drugs are reimbursed for patients covered under Medicare. Additionally, CMS provided add'l detail on the "special" TDAPA 2-year period that would establish modifications to the ESRD base-rate (which is what previously was done with calcimimetics after an IV version was approved, see here).
However, Xphozah will not be included in the "special" TDAPA and instead would be adjusted via a normal new-renal drug TDAPA add-on adjustment despite being included as an oral-only drug in the bundle. Mgmt noted that certain drugs have seen utilization decreases or have had post-TDAPA adjustments that were not economically feasible for dialysis centers to cost-effectively use the drug (despite being effective).

    111.   Defendant Raab's statement was not true; in fact, Ardelyx had decided not to enter

TDAPA based on the experience of Korsuva and Parsabiv.

        *ii.*   *Defendants admit that Ardelyx had known long before June 2024 that TDAPA would "effectively eliminate" access to XPHOZAH*

112.    On July 17, 2024, Ardelyx sued CMS to challenge its determination to add XPHOZAH to the Bundle. *Ardelyx, Inc. v. Becerra*, 24-cv-2095-BAH (D.D.C.) ("CMS Action").

113.    On September 19, 2024, Ardelyx filed a motion seeking a preliminary injunction. Ardelyx supported its motion with a declaration from Defendant Williams ("Opening Williams Dec."). CMS Action Dkt. No. 14-3.

114.    In her Opening Declaration, Williams explained why, in Ardelyx's view, XPHOZAH use would plummet even under TDAPA.

115.    According to Williams, TDAPA payments "do not cover the full cost to the dialysis facility of providing … prescription drugs" because average sales price includes discounts negotiated by large chains which are not available to smaller facilities. Williams Opening Dec. ¶¶ 70-72. Further, "[t]he limited long-term reimbursement provided by CMS for novel drugs … significantly discourages dialysis providers from adopting or facilitating the uptake of novel treatments." *Id.* ¶74. Williams declared that "[e]xperience with drugs like Parsabiv … has shown that when TDAPA support expires and novel treatments are added to the bundle, **access to these treatments plummets**." *Id.* ¶ 75.

116.    CMS opposed Ardelyx's motion for a preliminary injunction. CMS argued, in part, that Ardelyx could not show irreparable harm because under TDAPA, Ardelyx could have avoided its own damages.

117.    In response, Ardelyx claimed that "'even during the TDAPA period, the restrictions placed on XPHOZAH would be such that patient access to this novel therapy would be effectively eliminated for all patients.'" CMS Action, Dkt. #20, at 23 (quoting July 2, 2024 Ardelyx press release). Ardelyx also told the United States Court of Appeals for the District of Columbia that "Ardelyx chose not to apply for TDAPA after its investigation revealed that, even with the TDAPA

27

subsidies, 'access to [XPHOZAH] would be effectively eliminated for all patients' once XPHOZAH was in the bundle." *Ardelyx, Inc. v. Becerra*, 24-5290, Document # 2091842, at 10 (D.C. Cir.).

118.    To support its argument, Ardelyx submitted a Declaration by Defendant Williams. CMS Action Dkt. No. 20-1 ("Reply Williams Declaration"), purporting to explain how Ardelyx had determined that "applying for TDAPA would not have helped patients access XPHOZAH, either during or after the TDAPA period." *Id.* at ¶5.

119.    In her Declaration, Williams maintained that after XPHOZAH's FDA approval in October 2023, "Ardelyx began with the assumption that it would apply to include XPHOZAH in the TDAPA program." *Id.* at ¶7.

120.    However, Williams continued, "[a]s Ardelyx further analyzed XPHOZAH's commercial opportunity in the first half of 2024, Ardelyx determined that even during the TDAPA period, the restrictions placed on XPHOZAH would be such that patient access to this novel therapy would be effectively eliminated for all patients." *Id.* at ¶11.

121.    Williams explained that "as part of the exploration of XPHOZAH's commercial opportunity, Ardelyx considered the real-world experience of Korsuva ... that was subject to TDAPA until March 2024."

122.    Williams explained that "[i]n the course of analyzing Korsuva's recent experience ... I came to understand that dialysis facilities increasingly considered TDAPA payments inadequate to support access to needed drugs." *Id.* at ¶13.

123.    Williams added that "I further understand that many dialysis organizations were unwilling to initiate patients on Korsuva, a drug for which they would have had to absorb the full cost of providing under the ESRD PPS after the … TDAPA period ended."

124. Finally, Williams stated that "I also learned that … providers would have been heavily disincentivized to prescribe XPHOZAH during the TDAPA period in order to avoid having to cease prescribing XPHOZAH at the end of that short period." *Id.* at ¶16.

125. Concluding, Williams stated that "Ardelyx's decision … to change its previously assumed path and forego applying to include XPHOZAH in TDAPA was grounded in a well-studied assessment of market realities and the TDAPA program's structural shortcomings."

126. Not once in her two declarations did Williams **ever** mention the proposed rules CMS issued on June 27, 2024, or any other CMS document issued in June 2024. Raab's claim that Ardelyx's decision not to file for TDAPA approval based on CMS's June 27, 2024 proposed rules was a fabrication. Raab thereby aimed to conceal that Ardelyx had known long before July 2, 2024, that TDAPA would "effectively eliminate" XPHOZAH's market but had told investors the opposite while the two senior executives most directly involved made millions of dollars selling their shares to an unsuspecting public.

## F.    DEFENDANTS' FALSE STATEMENTS

127. On February 22, 2024, Ardelyx filed its 2023 10-K. In the 2023 10-K, Defendants stated:

> Absent further legislation or regulation on this matter, beginning in January 2025, oral ESRD-related drugs without injectable or intravenous equivalents, including XPHOZAH and all other phosphate lowering medications, will be included in the ESRD bundle and separate Medicare payment for these drugs will no longer be available, as is the case today under Medicare Part D. ***ESRD facilities may nonetheless receive a TDAPA for new renal dialysis drugs and biological products that meet certain criteria for a period of two years.*** The TDAPA payment is based on 100 percent of average sales price (ASP). If ASP is not available, then the TDAPA is based on 100 percent of wholesale acquisition cost (WAC). If WAC is unavailable, then the payment is based on the drug manufacturer's invoice. ***There can be no assurances that CMS will determine that XPHOZAH will qualify for TDAPA status.*** Even if deemed eligible by CMS***, revenue for sales of XPHOZAH could be significantly less in the TDAPA period than it would be if XPHOZAH is not bundled into the ESRD PPS.*** Moreover, in the post-TPDAPA period,

29

CMS currently expects to increase the single bundled payment base rate paid to the dialysis facility for each dialysis treatment to reflect that oral only phosphate lowering drugs will be reimbursed as part of the single bundled payment for Medicare patients. There can be no assurances that any increase in the single bundled payment base rate will be sufficient to adequately reimburse the dialysis facilities for XPOHZAH at a price that is profitable for us. The inclusion of XPHOZAH in the ESRD PPS would affect our ability to optimize the commercialization of XPHOZAH, will negatively and materially impact the revenue that we may generate on sales of XPHOZAH and could materially impact our profitability, results of operations, financial condition, and prospects.

128.    Defendants' statements were misleading because they stated that: (i) ESRD facilities will receive TDAPA payments unless CMS determines that XPHOZAH does not qualify for TDAPA status; (ii) it is only possible, and not a certainty, that XPHOZAH's use would decrease during the TDAPA period; and (iii) Ardelyx would apply for TDAPA. In fact, as Defendant Raab stated, "[it] is absolutely clear that ***within the bundle and beginning with TDAPA***, the restrictions placed on exposure would ***effectively eliminate patient access*** to this novel therapy for all patients" and Ardelyx did not intend to apply for TDAPA because XPHOZAH would lose its market even during the TDAPA period, let alone thereafter.

129.    On March 5, 2024, Defendant Rodriguez appeared on a panel at the TD Cowen 44th Annual Healthcare Conference. Defendant Rodriguez was on the panel to represent Ardelyx. During the presentation, the following exchange occurred:

Okay. So moving back, we're going to just do now one question round-robin style. So I guess one of the major outstanding questions that we usually get is what is Ardelyx's strategy? Is it oral-only drugs are included in ESRD bundle?

So inclusion is currently set to occur on January 1, 2025. And there has been some precedent that this has been delayed previously. And there is also a bill, HR and private, it's important that we do introduce that would delay it until 2033.

I guess three main points on this is that how likely do you think is the oral drugs will be included in the bundle, given the previous precedents and the current political climate around pricing and access? How does this change your internal peak sales estimates and number of patients? XPHOZAH is included or not included? And then finally, I guess, how

30

are you thinking about the timing for a data [ph] payment? And what is the rollout -- timeline for that?

DEFENDANT RODRIGUEZ:

     *     *     *     *     *

Should the bundle not be delayed, despite everybody's best efforts and support, and the fact that it's bad medicine, ***it does move into this transition period, where it moves on the Medicare side XPHOZAH from a Part D pharmacy benefit drug to a Part B drug.*** And then through the transition period and it's paid based on ASP. So that's the period where CMS, the rationale is that they use that period to collect data on utilization, and then that it's based on that utilization over the transition period that they then calculate the rate that will be added to the bundle to cover phosphorus-lowering therapy.

So it's really unprecedented for oral -- chronic oral medications that were historically paid pharmacy benefit to move into this kind of a system. Every other drug that has gone through this process is an infused drug, as part of the dialysis procedure. So this is chronic therapy taking daily that actually can't be taken at the time of the dialysis procedure. ***So exactly how this will work in that transition during—TDAPA is really very hard to predict.*** But as an innovation focused company, we will be quite dedicated, very persistent, in doing everything we can to make sure that all patients who need XPHOZAH will have access to XPHOZAH.

130. Defendant's statements were misleading by stating that: (i) if HR-5074 was passed, then XPHOZAH would go into TDAPA; (ii) as a result, Ardelyx intended to apply for TDAPA; and (iii) the consequence of TDAPA was difficult to predict. In fact, XPHOZAH would not go into TDAPA unless Ardelyx applied, Defendants had determined not to apply, and it was not "really very hard to predict" how XPHOZAH would fare during the TDAPA period: "It is absolutely clear that within the bundle and beginning with TDAPA, the restrictions placed on exposure would effectively eliminate patient access to this novel therapy for all patients."

131. On May 2, 2024, Ardelyx filed its 10-Q for the quarter ended March 31, 2024. Defendant Raab certified the accuracy of the 10-Q. The 10-Q provided:

Absent further legislation or regulation on this matter, beginning in January 2025, oral ESRD-related drugs without injectable or intravenous equivalents, including XPHOZAH and all other phosphate lowering medications, will be included in the ESRD bundle and separate Medicare payment for these drugs will no longer be available, as is the case today under Medicare Part D. ***ESRD facilities may nonetheless receive a Transitional Drug Add***

***on Payment Adjustment (TDAPA) for new renal dialysis drugs and biological products dispensed to Medicare beneficiaries that meet certain criteria for a period of two years.*** The TDAPA payment is based on 100 percent of average sales price (ASP). If ASP is not available, then the TDAPA is based on 100 percent of wholesale acquisition cost (WAC). If WAC is unavailable, then the payment is based on the drug manufacturer's invoice. ***There can be no assurances that CMS will determine that XPHOZAH will qualify for TDAPA status***, or that Medicare Advantage Plans will pay a TDAPA if XPHOZAH is dispensed to Medicare beneficiaries covered by Medicare Advantage Plans. ***Even if deemed eligible by CMS, revenue for sales of XPHOZAH could be significantly less in the TDAPA period than it would be if XPHOZAH is not bundled into the ESRD PPS.*** Moreover, in the post-TPDAPA period, CMS currently expects to increase the single bundled payment base rate paid to the dialysis facility for each dialysis treatment to reflect that oral only phosphate lowering drugs will be reimbursed as part of the single bundled payment for Medicare patients. There can be no assurances that any increase in the single bundled payment base rate will be sufficient to adequately reimburse the dialysis facilities for XPOHZAH at a price that is profitable for us. The inclusion of XPHOZAH in the ESRD PPS would affect our ability to optimize the commercialization of XPHOZAH, will negatively and materially impact the revenue that we may generate on sales of XPHOZAH and could materially impact our profitability, results of operations, financial condition, and prospects.

132.    Defendants' statements were misleading because they stated that: (i) ESRD facilities will receive TDAPA payments unless CMS determines that XPHOZAH does not qualify for TDAPA status; (ii) it is only possible, and not a certainty, that XPHOZAH's use would decrease during the TDAPA period; and (iii) Ardelyx would apply for TDAPA. In fact, as Defendant Raab stated, "[it] is absolutely clear that ***within the bundle and beginning with TDAPA***, the restrictions placed on exposure would ***effectively eliminate patient access*** to this novel therapy for all patients" and Ardelyx did not intend to apply for TDAPA because XPHOZAH would lose its market even during the TDAPA period, let alone thereafter.

133.    On May 2, 2024, Ardelyx held a call to discuss Q1 2024 earnings. On the call, the following exchange occurred:

Q: A few questions for me, if I may. … And then secondly, I want to take another stab at this question, but on H.R.5074, if the bill is to be signed into law in the first half of '25,

XPHOZAH need to go into TDAPA. But then if the bill gets signed, XPHOZAH would need to come back out of TDAPA. Can you perhaps shed some light on that process and some of the logistics around that?

DEFENDANT RAAB: Hey, [analyst]. Yeah, let me just directly address that quickly. ***You know, currently, I think, as we've said, our intent is to enter TDAPA.*** I think the specifics of what you're just describing, you know—that's going to play out over time, but you know, our current intent is to go through the process. And as we hope in the work that we're doing and what Buddy Carter's doing and others on the Hill, is understanding how important this medicine is for patients. This is good policy.

This is the right thing to do to ensure that patients get access to a drug that's already beginning to make a difference in many, many lives of dialysis patients. So the work continues and the specifics about how things come in and out based upon these next six months or more, you know, we'll get that to you as—as—as we also learn.

134.     Defendants' statements were false because Ardelyx did not intend to apply for TDAPA as it was not a viable option. Rather, "[i]t is absolutely clear that within the bundle and beginning with TDAPA, the restrictions placed on exposure would effectively eliminate patient access to this novel therapy for all patients."

### G.     LOSS CAUSATION

135.     On July 2, 2024, Defendants issued a press release and held a call to announce that the deadline to file for TDAPA had passed and that Ardelyx had not applied.

136.     On the call, in prepared remarks, Defendant Raab stated that "[it] is absolutely clear that within the bundle and beginning with TDAPA, the restrictions placed on exposure would effectively eliminate patient access to this novel therapy for all patients."

137.     On July 2, 2024, the price of Ardelyx's shares fell from their previous close of $7.57 to close at $5.28, down $2.29 (30.2%), damaging investors.

33

### H.    ADDITIONAL FACTS FURTHER PROBATIVE OF SCIENTER

#### i.    Stock Sales

138.    As set out in ¶¶94-103, the two Ardelyx executives most closely involved in discussions with CMS about inclusion in the Bundle and TDAPA both sold large portions of their shares in sales that were completely out of character with their previous trading.

#### ii.    Investor Interest in TDAPA

139.    Analysts made clear to Defendants in questions they posed and in reports they published that investors were closely focused on TDAPA.

140.    For example, at the Piper Sandler Annual Healthcare Conference on November 29, 2023, an analyst prefaced a question about inclusion of XPHOZAH in the Bundle and TDAPA to Ardelyx's CFO and COO with a comment that "a key issue that **comes up with investors all the time** and it's around the potential of adding binders or phosphate lowering agents to the bundle."

141.    In a February 22, 2024 report, a TD Cowen analyst wrote that:

A key investor focus continues to be on potential inclusion of Xphozah in the ESRD [end stage renal disease] bundle slated for Jan. 2025 and the implications for revenues. Recall that HR 5074 has been introduced into the House and would delay inclusion until Jan. 2033, though timelines on an update are unclear. We look forward to updates on this process and a potential application for TDAPA this year. Recall our revenue estimates include a risk adjustment for the bundle.

142.    Also on February 22, 2024, a Jefferies analyst published a report announcing that it would be hosting meetings with Ardelyx management. In its summary of the "big picture," Jefferies focused on addition to the bundle and TDAPA:

Big Picture: [Ardelyx] has been a solid performer and +40% vs XBI +6% YTD driven by new $1B LT peak sales guidance for Ibsrela and a solid Xphozah launch thus far. The story looks clean though investors are closely following HR-5074 and if the bundling dynamic can be delayed - until then we sense the market may not give full credit to Xphozah revenue beats (on track to beat Q1 consensus). Recall, the law as it stands has oral phosphate lowering drugs like Xphozah moving into the bundled payment system starting with a 2

year TDAPA in 2025. HR-5074, which has bipartisan support, was proposed to delay this until 2033. The financial implications are significant as this would impact Xphozah's revenue growth post-TDAPA starting in 2027.

143.    At the March 5, 2024 panel at the TD Cowen Annual Health Care Conference on March 5, 2024, just before Rodriguez made her false statement, an analyst told her that "one of the major outstanding questions is what is Ardelyx's strategy if oral-only drugs are included in ESRD bundle?" [check] The analyst then specifically mentioned "how are you thinking about the timing for TDAPA payment?"

144.    At the May 2, 2024 Q1 2024 earnings call, analysts again demonstrated investor interest in TDAPA. An analyst initially asked Defendants "[y]ou're not in the business of predicting legislation, but in the absence of any progress in terms of pushing the phosphate binders into the bundle, pushing that off, at what point do you start maybe planning for that as a reality." Then, when Defendant Raab evaded the question, another analyst returned to the question asking "[a]nd then secondly, I want to take another stab at this question. But on HR-5024, if the bill is to be signed into law in the first half of '25, XPHOZAH would need to go into TDAPA. But then if the bill gets signed, XPHOZAH would need to come back out of TDAPA. Can you perhaps shed some light on that process and some of the logistics surrounding that?"

### iii.    False exculpatory statements

145.    As further set out above at ¶¶94-103, on the July 2, 2024 call, Defendant Raab falsely stated that Ardelyx had decided not to apply for TDAPA because of proposed regulations issued by CMS on June 27, 2024. Raab's answer was designed to give investors the impression that the change in Ardelyx's position resulted from changed circumstances, rather than from facts Ardelyx had known all along. Raab's answer also gave investors and regulators the impression

that Grammer's and Williams's massive unplanned class period sales were not made while in possession, and on the basis, of material nonpublic information.

146.    Yet when asked to explain to a court under penalty of perjury how Ardelyx had actually concluded that even under TDAPA, access to XPHOZAH would be "effectively eliminated," Ardelyx never even mentioned the June 27, 2024 proposed CMS regulations.

            *iv.*    *Defendants' Statements to Investors Contradicted the Statements They Made to Investors*

147.    As set out above in ¶¶127-134, Defendants told investors that Ardelyx intended to apply for TDAPA and that it represented a viable option.

148.    As set out above in ¶¶58-81, Defendants told CMS that inclusion in the Bundle, regardless of TDAPA reimbursement, was not viable.

149.    Defendants' inconsistent statements support scienter

            *v.*    *Defendants Were Experts In Nephrology*

150.    On a March 2, 2023 call to discuss Ardelyx's Q4 2022 earnings, Defendant Rodriguze boasted that Ardelyx's senior executive team is "well steeped in nephrology, well networked across the country, and … in a high-level of preparedness" for the XPHOZAH launch.

151.    Defendants Raab and Rodriguez have both led launches of new renal therapeutic products.

152.    Defendants repeatedly boasted on conference calls with investors that Ardelyx had a 60 XPHOZAH salesforce who spoke with nephrologists every day. And on an October 18, 2023 call to discuss XPHOZAH's approval, Defendant Rodriguez stated that the salesforce was already in place.

153.    Defendants also boasted to investors that they had laid the groundwork for coverage with payers. As Defendant Rodriguez stated on the February 22, 2024 call to discuss Ardelyx's Q4

2023 earnings, "[w]e have been engaged with payers really months in advance of the approval, post-approval, now with the final label, and they're defining their coverage policies exactly as we anticipated."

## I.    INDIVIDUAL DEFENDANTS' SCIENTER IS IMPUTED TO ARDELYX

154.    Ardelyx is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

155.    The scienter of the Individual Defendants and other employees and agents of Ardelyx is similarly imputed to the Company under *respondeat superior* and agency principles.

156.    The scienter of Raab and Rodriguez is imputed to Ardelyx because they made the statements complained of herein. In addition, the scienter of Raab is imputed to Ardelyx because he was its CEO and highest-paid officer.

157.    The scienter of Grammer and Williams is imputed to Ardelyx because the statements complained of herein concerned CMS reimbursement and TDAPA, and Grammer and Williams were the two Ardelyx most closely involved in evaluating these topics. For example, Grammer and Williams delivered the March 11, 2024 presentation in which they explained to CMS that Ardelyx would lose its XPHOZAH market even during the TDAPA period. Grammer and Williams would have had to familiarize themselves with the topics, so they would furnish information for use in Ardelyx's 2023 10-K and Q1 2024 10-Q.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

158.    Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than who purchased Ardelyx, Inc. securities between February 23, 2024, and July 1, 2024, both dates inclusive, and

37

held such securities through July 1, 2024 ("Class"). Excluded from the Class are Individual Defendants, the officers and directors of Ardelyx, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

159.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Ardelyx common stocks were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands, of members in the proposed Class.

160.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

161.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

162.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, the financial condition, business, operations, and management of Ardelyx;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused Ardelyx to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings and statements;

- whether the prices of Ardelyx common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

163.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

<u>**PRESUMPTION OF RELIANCE**</u>

164.    At all relevant times, the market for Ardelyx's common stock was an efficient market for the following reasons, among others:

- Ardelyx common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

- As a regulated issuer, Ardelyx filed periodic public reports with the SEC and the NASDAQ;

- Ardelyx regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- Ardelyx was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

- Unexpected corporate announcements were followed by immediate stock price movements.

165.    As a result of the foregoing, the market for Ardelyx's common stock promptly digested current information regarding Ardelyx from all publicly available sources and reflected such information in the price of Ardelyx's common stock. Under these circumstances, all purchasers and acquirers of Ardelyx's common stock during the Class Period suffered similar injury through their purchase or acquisition of Ardelyx's common stock at artificially inflated prices and the presumption of reliance applies.

166.    Further, at all relevant times, Plaintiffs and all other Class members reasonably relied upon the Defendants to disclose material information as required by law and in the Company's SEC filings. Plaintiffs and the other Class members would not have purchased or otherwise acquired Ardelyx common stock at artificially inflated prices if the Defendants had disclosed all material information as required. Thus, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business,

Plaintiffs and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of the State of Utah v. United States,* 406 U.S. 128 (1972).

## THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

167.    The Private Securities Litigation Reform Act's statutory safe harbor and the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and materially misleading statements alleged herein.

168.    None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions relating to Ardelyx's business at the time such statement was made.

169.    To the extent that any of the false and materially misleading statements alleged herein can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement.

170.    To the extent that the statutory safe harbor does apply to any forward-looking statement alleged herein, the Defendants are liable for any such statement because at the time such statement was made, the particular speaker actually knew that the statement was false or misleading, and/or the statement was authorized and/or approved by an executive officer of Ardelyx who actually knew that such statement was false when made.

171.    Moreover, to the extent that any Defendant issued any disclosures purportedly designed to "warn" or "caution" investors of certain "risks," those disclosures were also materially false and/or misleading when made because they did not disclose that the risks that were the subject

of such warnings had already materialized and/or because such Defendant had the requisite state of mind.

**COUNT I**
**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

172.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

173.    Plaintiffs assert this claim against all Defendants, basing the claim upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

174.    During the Class Period, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b), the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations, omitted material facts, and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

175.    The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5(a) and (c) in that they employed devices, schemes and artifices to defraud and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Ardelyx securities and directly impacted the price of Ardelyx's common stock during the Class Period.

176.    The Company and the Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in Ardelyx's name were materially false and misleading and omitted material information; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the

investing public; and knowingly or recklessly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  These Individual Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements or material omissions, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein. Information showing that Ardelyx, by and through the Individual Defendants, and other senior Ardelyx officers and employees, acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.

177.    The Individual Defendants knew or recklessly disregarded the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Ardelyx personnel to members of the investing public, including Plaintiffs and the Class.

178.    As a direct and proximate result of the scheme or artifice to defraud that lead directly to Ardelyx's disclosing materially false and misleading information, the market price of Ardelyx's securities was artificially inflated during the Class Period. In ignorance of the falsity of the statements at issue, Plaintiffs and the other members of the Class relied on the statements described above and/or on the integrity of the market price of Ardelyx's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Ardelyx's false and misleading statements and omissions.

179.    Had Plaintiffs and the other members of the Class been aware that the market price of Ardelyx's securities had been artificially and falsely inflated by the fraudulent scheme that caused Ardelyx to issue misleading financial statements, and by the material adverse information which the Company did not disclose, causing artificial inflation in Ardelyx's stock price, they would not have purchased Ardelyx's securities at the artificially inflated prices that they did, or at all.

180.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

181.    By reason of the foregoing, Defendants Ardelyx and the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of Ardelyx's securities during the Class Period.

**<u>COUNT II</u>**
**Insider Trading Violations of Section 10(b) of the Exchange Act**
**<u>Against Defendants Grammer and Williams</u>**

182.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

183.    Grammer and Williams were in possession of material non-public information during the Class Period, as further alleged above, including that (a) Ardelyx would not apply for TDAPA; (b) the reason Ardelyx would not apply for TDAPA was that it had concluded that access to XPHOZAH would be "effectively eliminated" during the TDAPA period ("Omitted Facts").

184.    Grammer and Williams knew the Omitted Facts were material to Ardelyx Investors.

185.    As set out in their PSLRA Certifications, Plaintiffs purchased shares contemporaneously with Grammer's and Williams's sales.

186.    Grammer and Williams are liable to all persons purchasing Ardelyx shares contemporaneously with Grammer's and Williams's sales.

### COUNT III
#### Violation of Section 20A of the Exchange Act
#### Against Defendants Grammer and Williams

187.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

188.    This count is against Defendants Grammer and Williams for insider trading.

189.    All Defendants violated Section 10(b)'s prohibitions.

190.    In addition, Grammer and Williams violated Section 10(b)'s prohibitions against insider trading.

191.    Grammer and Williams were in possession of material nonpublic information at the time they sold Ardelyx shares.

192.    As set out in their PSLRA Certifications, Plaintiffs purchased shares contemporaneously with Grammer's and Williams's sales.

193.    Plaintiffs and Class members who purchased Ardelyx chares contemporaneously with sales by Grammer and Williams suffered damages.

194.    This action was filed within five years of each Class member's purchase of Ardelyx securities contemporaneous with Grammer and Williams's sales of Ardelyx shares.

### COUNT IV
#### Violations of Section 20(a) of the Exchange Act
#### Against the Individual Defendants

195.    During the Class Period, Ardelyx, by and through its officers and directors, violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

196.    The Individual Defendants participated in the operation and management of Ardelyx and its operating units, and conducted and participated, directly and indirectly, in the conduct of Ardelyx's business affairs. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Ardelyx's financial condition and results of operations, and to correct promptly any public statements issued by Ardelyx which had become materially false or misleading.

197.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Ardelyx disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority over Ardelyx. The Individual Defendants, therefore, were "controlling persons" of Ardelyx within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Ardelyx's securities.

198.    Each of the Individual Defendants, therefore, acted as a controlling person of Ardelyx. By reason of their senior management positions and/or being directors of Ardelyx, each of the Individual Defendants had the power to direct the actions of, and exercised the same, to cause Ardelyx to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Ardelyx and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

199.    By reason of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act and are jointly and severally liable to the Plaintiffs and the other members of

the Class for substantial damages that they suffered in connection with their purchases of Ardelyx securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Lead Counsel;

(b)    awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c)    awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: January 13, 2025                Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

*/s/ Jonathan Horne*
Jonathan Horne (*pro hac vice*)
Laurence M. Rosen, Esq. (*pro hac vice* to be submitted)
Joshua Baker, Esq. (BBO #695561)
Phillip Kim, Esq. (*pro hac vice* to be submitted)
THE ROSEN LAW FIRM, P.A
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827

47

Email: jhorne@rosenlegal.com
Email: lrosen@rosenlegal.com
Email: jbaker@rosenlegal.com
Email: pkim@rosenlegal.com

*Lead Counsel for Plaintiffs and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 13, 2025, a true and correct copy of the foregoing **AMENDED COMPLAINT** was served by CM/ECF to the parties registered to the Court's CM/ECF system.

<u>/s/Jonathan Horne</u>

## CERTIFICATION

The individual or institution listed below (the "Plaintiff") authorizes the firm to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against Ardelyx, Inc. (NASDAQ: ARDX), and their current and former officers, and others in connection with the purchase and sale of securities issued by Ardelyx, Inc.

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.    I have reviewed a complaint against Ardelyx, Inc. and certain of their officers and directors and I authorize the firm to file a lead plaintiff motion on my behalf.

2.    I did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.    I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.    The following is a list of all of the purchases and sales I have made in Ardelyx, Inc. securities during the Class Period set forth in the complaint. I have made no transactions during the class period in the securities that are the subject of this lawsuit except those set forth below.

        See Schedule A

5.    I have not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except for the following company(ies):

6.    I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this day ___1/8/2025_____.

Signature ___[signature]___

Name: Gary Slavik

## SCHEDULE A

### Gary Slavik

CLASS PERIOD TRANSACTIONS

### PURCHASES

| DATE | SHARES | PRICE |
|------|--------|-------|
| 5/6/2024 | 11 | ($8.70) |

# CERTIFICATION

The individual or institution listed below (the "Plaintiff") authorizes the firm to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against Ardelyx, Inc. (NASDAQ: ARDX), and their current and former officers, and others in connection with the purchase and sale of securities issued by Ardelyx, Inc.

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.  I have reviewed a complaint against Ardelyx, Inc. and certain of their officers and directors and I authorize the firm to file a lead plaintiff motion on my behalf.

2.  I did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.  I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.  The following is a list of all of the purchases and sales I have made in Ardelyx, Inc. securities during the Class Period set forth in the complaint. I have made no transactions during the class period in the securities that are the subject of this lawsuit except those set forth below.

    See Schedule A

5.  I have not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except for the following company(ies):

6.  I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this day __1/8/2025_____.

Signature: _Osama A. Shoair_
                    8735CD53F08E4B2...

Name: Osama Shoair

## SCHEDULE A

### Osama Shoair

CLASS PERIOD TRANSACTIONS

### PURCHASES

| DATE | SHARES | PRICE |
|------|--------|-------|
| 2/22/2024 | 3,900 | ($8.82) |
| 2/22/2024 | 4,141 | ($8.82) |
| 2/22/2024 | 14,009 | ($8.83) |
| 2/23/2024 | 218 | ($8.69) |
| 2/23/2024 | 509 | ($8.68) |
| 2/23/2024 | 800 | ($8.69) |
| 2/23/2024 | 1,000 | ($8.67) |
| 2/23/2024 | 1,053 | ($8.68) |
| 2/23/2024 | 3,382 | ($8.69) |
| 2/23/2024 | 3,686 | ($8.68) |
| 2/23/2024 | 19,352 | ($8.70) |
| 3/4/2024 | 500 | ($9.03) |
| 3/4/2024 | 816 | ($9.03) |
| 3/4/2024 | 4,830 | ($9.00) |
| 3/4/2024 | 10,354 | ($9.04) |
| 3/11/2024 | 100 | ($8.52) |
| 3/11/2024 | 500 | ($8.50) |
| 3/11/2024 | 822 | ($8.50) |
| 3/11/2024 | 4,111 | ($8.52) |
| 3/11/2024 | 7,467 | ($8.53) |
| 3/14/2024 | 1 | ($8.05) |
| 3/14/2024 | 18 | ($8.04) |
| 3/14/2024 | 82 | ($8.07) |
| 3/14/2024 | 300 | ($8.08) |
| 3/14/2024 | 899 | ($8.06) |
| 3/14/2024 | 1,000 | ($8.05) |
| 3/14/2024 | 1,000 | ($8.04) |
| 3/14/2024 | 1,000 | ($8.03) |
| 3/14/2024 | 1,000 | ($8.02) |
| 3/14/2024 | 1,000 | ($8.01)0 |
| 3/14/2024 | 1,000 | ($7.99) |
| 3/14/2024 | 1,700 | ($8.00) |
| 3/14/2024 | 2,000 | ($8.07) |
| 3/15/2024 | 37 | ($8.03) |
| 3/15/2024 | 168 | ($8.05) |
| 3/15/2024 | 204 | ($8.03) |

| 5/21/2024 | 3,980 | ($7.76) |
| 6/7/2024 | 5,559 | ($6.47) |
| 6/10/2024 | 7,530 | ($6.34) |

## SALES

| DATE | SHARES | PRICE |
| --- | --- | --- |
| 2/23/2024 | 15,036 | $8.78 |
| 2/23/2024 | 13,979 | $8.62 |
| 2/23/2024 | 7,876 | $8.77 |
| 2/23/2024 | 5,560 | $8.63 |
| 2/23/2024 | 4,367 | $8.62 |
| 2/23/2024 | 4,200 | $8.79 |
| 2/23/2024 | 2,700 | $8.63 |
| 2/23/2024 | 2,194 | $8.63 |
| 2/23/2024 | 1,888 | $8.79 |
| 2/23/2024 | 1,200 | $8.62 |
| 3/4/2024 | 500 | $9.04 |
| 3/4/2024 | 90 | $9.04 |
| 3/4/2024 | 10 | $9.05 |
| 3/6/2024 | 2,600 | $9.66 |
| 3/6/2024 | 300 | $9.67 |
| 3/11/2024 | 7,500 | $8.52 |
| 3/11/2024 | 5,751 | $8.58 |
| 3/11/2024 | 2,868 | $8.57 |
| 3/11/2024 | 2,107 | $8.53 |
| 3/11/2024 | 2,075 | $8.57 |
| 3/11/2024 | 1,866 | $8.55 |
| 3/11/2024 | 1,605 | $8.59 |
| 3/11/2024 | 902 | $8.54 |
| 3/11/2024 | 701 | $8.57 |
| 3/11/2024 | 325 | $8.53 |
| 3/11/2024 | 200 | $8.54 |
| 3/11/2024 | 100 | $8.53 |
| 3/15/2024 | 37 | $8.03 |
| 3/18/2024 | 8,468 | $7.83 |
| 3/18/2024 | 2,804 | $7.87 |
| 3/18/2024 | 100 | $7.88 |
| 5/21/2024 | 3,955 | $7.76 |
| 5/21/2024 | 25 | $7.76 |
| 6/10/2024 | 9,317 | $6.35 |